David J. Jordan (#1751)
David L. Mortensen (#8242)
Aaron T. Brogdon (#9796)
STOEL RIVES LLP
201 South Main Street, Suite 1100
Salt Lake City, Utah 84111
Telephone: (801) 328-3131
Facsimile: (801) 578-6999

Lonnie Coleman (*Admitted Pro Hac Vice*)
KRAMER, COLEMAN, WACTLAR & LIEBERMAN
100 Jericho Quadrangle, Suite 225
Jericho, NY 11753
Telephone: (516) 822-4820
Facsimile: (516) 822-4824

Attorneys for Defendant

**IN THE UNITED STATES DISTRICT COURT**
**DISTRICT OF UTAH, CENTRAL DIVISION**

| | | |
|---|---|---|
| SLICEX, INC., | : | **FINDINGS OF FACT AND** |
| | : | **CONCLUSIONS OF LAW WITH** |
| Plaintiff, | : | **REGARD TO PLAINTIFF'S SECOND** |
| | : | **CLAIM FOR RELIEF** |
| vs. | : | |
| | : | Civil No. 2:04 CV 00615TS |
| AEROFLEX COLORADO SPRINGS, INC., | : | |
| f/k/a AEROFLEX UTMC | : | The Honorable Ted Stewart |
| MICROELECTRONIC SYSTEMS, INC., | : | |
| | : | |
| Defendant. | : | |

This matter was tried before the Court on July 18 through 21, 2006, the Honorable Ted Stewart presiding. With regard to plaintiff SliceX, Inc.'s ("SliceX") second claim for relief, the Court, having reviewed the evidence, listened to the testimony, and heard the arguments

presented by the parties, and being fully advised in this matter, hereby enters the following findings of fact and conclusions of law:

## I. FINDINGS OF FACT

**A.      Background**

      1.      SliceX is a Utah corporation that has at all times relevant to this dispute been in the business of providing analog and mixed-signal design services. (Trial Transcript ("Transcript") at 91:7-11.)

      2.      Defendant Aeroflex Colorado Springs, Inc. ("Aeroflex") is a Colorado-based corporation in the business of designing and developing mixed-signal integrated circuits. (*Id*. at 270:1-23.)

      3.      Aeroflex contracts with various customers for the design and fabrication of mixed signal circuits. (*See* Transcript at 271:16-272:7.)

      4.      Aeroflex at times contracts with outside engineering firms to secure engineering services. (*Id*. at 272:8-12.) Aeroflex relies on a combination of those outside contract engineers and its own in-house engineering resources to meet the contractual deadlines set by its customers. (*Id*. at 273:3-18.) Relying on outside contract engineers is often necessary to avoid overstaffing during non-peak periods but carries with it certain disadvantages, such as higher cost and diminished control over the pace and progress of the work. (*See id*.)

**B.     The Parties' Duties and Performance under the Agreements**

5.     In order to meet contractual obligations to customers, Aeroflex engaged SliceX to provide certain engineering services under three consulting agreements dated (a) November 1, 2002, (b) February 12, 2003, and (c) October 23, 2003, (collectively, the "Agreements").  (*See* Trial Exs. 1, 3, 5).

6.     In the Agreements, SliceX agreed to provide specified engineering services, and Aeroflex agreed to pay SliceX for the services provided in accordance with the rates set forth in the Agreements.  (*See id*.)  Specifically, the Agreements described the parties' agreed-upon performances as follows:

a.     In the November 1, 2002 Agreement:

1)  *Services and Compensation*.

   a) SliceX, Inc. agrees to perform for UTMC the services described in Attachment I ("Services").

   b) The UTMC agrees to pay SliceX, Inc. the compensation set forth in Attachment I for the performance of the Services.

b.     In the February 12, 2003 Agreement:

1)  *Services and Compensation*.

   a) SliceX, Inc. agrees to perform for AEROFLEX UTMC the services described in Attachment I ("Development Work").

   b) The AEROFLEX UTMC agrees to pay SliceX, Inc. the compensation set forth in Attachment I for the performance of the Development Work . . .

c.      In the October 23, 2003 Agreement:

1)  *Services and Compensation*.

   a) SliceX, Inc. agrees to perform for AEROFLEX the services described in Attachment I ("Development Work").

3

>   AEROFLEX agrees to pay SliceX, Inc. the compensation set forth in Attachment I for the performance of the Development Work . . .

(Trial Exs. 1, 3, 5 at ¶ 1.)

       7.      The Agreements also contained express terms governing Aeroflex's conduct with regard to the hiring of individuals working for SliceX:

      a.      The November 1, 2002 Agreement provided as follows:

> UTMC agrees that UTMC shall not, for a period of three years immediately following the termination of this agreement, whether directly or indirectly:  . . . (b) solicit or take away, or attempt to solicit or take away, any employee of SliceX, Inc., either for UTMC's own benefit or for the benefit of any other person or entity.

      b.      The February 12, 2003 Agreement provided as follows:

> AEROFLEX UTMC agrees that AEROFLEX UTMC shall not, for a period of three years immediately following the termination of this agreement, whether directly or indirectly:  . . . (b) solicit or take away, or attempt to solicit or take away, any employee of SliceX, Inc., either for AEROFLEX UTMC's own benefit or for the benefit of any other person or entity.

      c.      Finally, the October 23, 2003 Agreement provided as follows:

> AEROFLEX agrees not to solicit or entice (other than normal employment discussions not initiated by AEROFLEX) for employment any of the current employees of SliceX for purposes of hiring such employee during the period of this Agreement and for a period of one year thereafter, without the prior written consent of SliceX.

(Trial Ex. 1 at ¶ 4; Trial Ex. 3 at ¶ 5; Trial Ex. 5 at ¶ 4.)

      2.      Each of the Agreements also provided that Aeroflex was permitted to terminate the respective agreement for any or no reason upon giving notice to SliceX.  (*See* Trial Ex. 1 at ¶ 6(b); Trial Ex. 3 at ¶ 7(b); Trial Ex. 5 at ¶ 6(b).)

      3.      Aeroflex fully performed under the Agreements; it paid for all of the services provided by SliceX.  (*See, e.g.*, Transcript at 200:5-201:9.)

## C. Aeroflex's Decision to Open a Grass Valley Facility

4. In 2003, Aeroflex learned that SliceX was experiencing significant financial difficulties and losing many of its employees. (*Id*. at 285:13-20; *see also* Memorandum Decision and Order Granting Defendant's Rule 52(c) Motion (the "Order") at 11.) SliceX had furloughed several Grass Valley employees, had placed the rest on 50% salary, and was adjusting some employees' salaried/hourly status to reduce its payroll expenses. (Transcript at 155:24-156:1, 387-88, 413:20-414:2, 415:19-416:8, 448:16-18, 452:14-20, 469:12-19; Trial Exs. B, E.) From time to time, SliceX missed its payroll and failed to reimburse its employees in a timely fashion for work-related expenses. (*Id*. at 391:10-22, 413:24-414:2, 415:8-15, 471:4-472:8.) As a result, the majority of SliceX's Grass Valley engineers left for other employment between the summer of 2003 and early spring of 2004. (*Id*. at 157-159, 390-91; *see also id*. at 180:6-9.)

5. Upon learning of SliceX's problems, Aeroflex grew concerned that SliceX might become unable to complete the services it had agreed to perform, potentially causing Aeroflex to miss its own contractual deadlines. (*See* Transcript at 285:13-20; Order at 11.)

6. As a result, Aeroflex was forced to consider alternative means of satisfying its contractual obligations with regard to the contracts for which it had retained SliceX's services. (*See* Transcript at 286:5-23; Trial Ex. 15 at 1; Order at 11.) Specifically, Aeroflex began exploring the possibility of opening its own design facility in Grass Valley, California, either by acquisition or by assembling

5

its own design team.  (*See* Transcript at 286:5-23; Trial Ex. 15 at 1; Order at 11.)

       7.      After considering its options, Aeroflex concluded that continuing to depend on SliceX was too risky and would not give Aeroflex an acceptable level of control over the pace of the work.  (*See* Transcript at 285:8-20, 286:24-287:7, 290:19-23; Trial Ex. 15.)  Aeroflex decided that its best course of action was to establish its own design facility to ensure that it could meet its contractual deadlines.  (*Id*. at 287:1-7, 290:14-18, 291:1-4; Order at 12.)

**D.**    **Aeroflex's Hiring of Former SliceX Employees**

       8.      Thereafter, Aeroflex ran a series of job postings on Monster.com beginning in late 2003 and running through the spring of 2004.  (Transcript at 300-301; Order at 12.)

       9.      Among other applicants, four individuals who were then working for SliceX, Jackie Snyder ("Snyder"), Steve Levy ("Levy"), David Rosky ("Rosky"), and Tom Grundy ("Grundy"), responded to Aeroflex's Monster.com posting and/or inquired about positions with Aeroflex.  (Transcript at 305:13-306:17, 392:11-19, 424:8-11, 473:19-24; Order at 12.)

       10.     SliceX's financial problems had led Snyder to look for new employment, and she found and responded to Aeroflex's February 2004 Monster.com advertisement in the course of her job search.  (Transcript at 392:5-16.)  No one directed her to Aeroflex's job posting.  (*Id*. at 392:17-19.)  Aeroflex did not inform her of the posting or solicit her application, and no one at Aeroflex asked her to recruit others to work at Aeroflex.  (*Id*. at 394:1-3, 395:25-396:2.)

After reviewing her application, Aeroflex interviewed Snyder, but she withdrew from consideration after deciding to accept employment at Intel. (*Id*. at 395:6-24.)

11. Levy had also decided to look for alternative employment due to SliceX's financial struggles. (Transcript at 421:15-422:10.) He conducted his search by talking to friends in the industry, and as part of his search, he went to Monster.com to explore possible opportunities in his area. (*Id*. at 422-24.) While prospecting on Monster.com, Levy found Aeroflex's posting and submitted an electronic application. (*Id*. at 424:8-11; Trial Ex. U1.) Levy interviewed with Aeroflex and eventually accepted a position. (*Id*. at 425:20-23.) Levy found Aeroflex's Monster.com job posting on his own; no one at Aeroflex informed him of or directed him to the posting. (*Id*. at 306:2-9, 428:7-12.) Aeroflex did not solicit Levy to apply and did not request that he recruit or inform others of the opportunity after he had applied. (*Id*. at 428:7-14, 429:6-12.)

12. SliceX's financial struggles also led Rosky, Levy's longtime personal friend, to seek new employment in early 2004. (Transcript at 452:21-453:7, 16-17.) Over the course of several months, Levy and Rosky discussed their respective job searches, and upon learning that Levy had applied for a position at Aeroflex, Rosky contacted David Kerwin ("Kerwin"), Aeroflex's Director of Mixed-Signal Products, to inquire about the possibility of working for Aeroflex as an independent consultant. (*Id*. at 453:16-454:6.) Rosky initiated this inquiry. (*Id*. at 454:9-15.) No one at Aeroflex contacted him to solicit him. (*Id*.)

13. Finally, Grundy also decided to leave SliceX due for compensation-related reasons. (Transcript at 473:15-18.) Grundy's job search, like Snyder's and Levy's, included searching Monster.com for job postings. (*Id*. at 473:20-24.) He also found Aeroflex's posting and submitted a résumé electronically. (*Id*. at 473:25-474:4.) Grundy found Aeroflex's posting with no prompting from anyone at Aeroflex, and no one at Aeroflex solicited him to seek employment at Aeroflex prior to his submission of a résumé. (*Id*. at 473:20-474:2, 477:4-8.) Like Rosky, Grundy eventually contracted with Aeroflex as an independent consultant. (*Id*. at 478:6-8.)

14. Based on the evidence presented and testimony heard, the Court finds that no one at Aeroflex told Snyder, Levy, Rosky, or Grundy about Aeroflex's Monster.com posting, and no one at Aeroflex solicited these individuals for employment. (*See* Transcript at 392:17-19, 394:1-3, 306:2-9, 428:7-12, 428:7-14, 429:6-12, 454:9-15, 473:20-474:2, 477:4-8; *see also* Order at 12.) Rather, the Court finds that each of these former SliceX employees initiated employment discussions with Aeroflex by either responding to the Monster.com job posting or contacting Aeroflex on his or her own, without assistance or prompting from anyone at Aeroflex. (*See* Transcript at 342:3-17, 392:17-19, 394:1-3, 428:7-14, 429:6-12, 477:4-8; *see also* Order at 12.)

15. Based on the evidence presented and testimony heard, the Court finds that each of these four engineers initiated contact with Aeroflex and that Aeroflex took no steps to solicit any of these former SliceX employees. (*See*

Transcript at 342:3-17, 392:17-19, 394:1-3, 428:7-14, 429:6-12, 477:4-8; Order at 12-13.)

## II. CONCLUSIONS OF LAW

**A.     Utah Law Imposes an Implied Covenant of Good Faith and Fair Dealing.**

1. Under Utah law, every contract is deemed to include an implied covenant of good faith and fair dealing, which prevents each party to the contract from "'intentionally or purposely do[ing] anything which will destroy or injure the other party's right to receive the fruits of [the] contract.'" *St. Benedict's Dev. Co. v. St. Benedict's Hosp.*, 811 P.2d 194, 199 (Utah 1991).

2. To succeed on a claim for breach of the implied covenant, a plaintiff must show that the defendant "intentionally or purposefully . . . defeat[ed] the [the plaintiff's] expectations." *Rawson v. Conover*, 20 P.3d 876, 885 (Utah 2001).

**B.     The Implied Covenant of Good Faith and Fair Dealing Cannot Be Used to Impose New, Independent Duties upon Aeroflex.**

3. "While a covenant of good faith and fair dealing inheres in almost every contract, some general principles limit the scope of the covenant." *Oakwood Village LLC v. Albertsons, Inc.*, 2004 UT 101, ¶ 45, 104 P.2d 1226. These include, but are not limited to, the following:

a. "First, this covenant cannot be read to establish new, independent rights or duties to which the parties did not agree ex ante." *Id*. (citing *Brehany v. Nordstrom, Inc.*, 812 P.2d 49, 55 (Utah 1991); *see also Seare v. Univ. of Utah Sch. of Med.*, 882 P.2d 673, 678 (Utah 1994); *Sanderson v. First Sec. Leasing Co.*, 844 P.2d 303, 308 (Utah 1992).

b.  "Second, this covenant cannot create rights and duties inconsistent with express contractual terms." *Oakwood Village*, 2004 UT 101, ¶ 45, 104 P.2d 1226 (citing *Brehany*, 812 P.2d at 55; *Rio Algom Corp. v. Jimco, Ltd.*, 618 P.2d 497, 505 (Utah 1980)).

c.  "Finally, [courts] will not use this covenant to achieve an outcome in harmony with the court's sense of justice but inconsistent with the express terms of the applicable contract." *Id.* (citing *Dalton v. Jerico Constr. Co.*, 642 P.2d 748, 750 (Utah 1982); *see also Ernie Haire Ford, Inc. v. Ford Motor Co.*, 260 F.3d 1285, 1291 (11th Cir. 2001) (The implied covenant of good faith and fair dealing "cannot override an express contractual term.").

4.  In short, courts "will not interpret the implied covenant of good faith and fair dealing to make a better contract for the parties than they made for themselves. Nor will [courts] construe the covenant to establish new, independent rights or duties not agreed upon by the parties." *Malibu Inv. Co. v. Sparks*, 2000 UT 30, ¶ 19, 996 P.2d 1043 (quoting *Brown v. Moore*, 973 P.2d 950, 954 (Utah 1998)) (other citations omitted).[1]

5.  The Court notes that courts in other jurisdictions have also held that "a party which acts in accordance with rights expressly provided in a contract

---

[1] *See also Seare*, 882 P.2d at 678 (citations omitted) (The implied covenant of good faith and fair dealing is "implied in contracts 'to protect the express covenants or promises of the contract.'"); *Rubin v. Laser*, 703 N.E.2d 453, 459 (Ill. Ct. App. 1998) ("[T]he doctrine of good faith and fair dealing does not serve to import new obligations into a contract. It merely controls how the obligations stated within the contract are to be performed."); *First v. Allstate Ins. Co.*, 222 F. Supp. 2d 1165, 1172 (C.D. Cal. 2002) ("Absent a contractual right . . . the implied covenant has nothing upon which to act as a supplement, and should not be endowed with an existence independent of its contractual underpinnings."); *Menpeco, USA, Inc. v. Swiss Bank Corp.*, 237 B.R. 12, 26 (S.D.N.Y. 1997) ("The implied covenant of good faith and fair dealing does not provide a court *carte blanche* to rewrite the parties' agreement. Thus, a court cannot imply a covenant inconsistent with the terms expressly set forth in the contract.")

10

cannot be held liable for breaching an implied covenant of good faith." *Menpeco*, 237 B.R. at 26; *see also Ari and Co., Inc. v. Regent Int'l Corp.*, 273 F. Supp.2d 518, 522 (S.D.N.Y. 2003) (A claim for breach of the implied covenant of good faith and fair dealing is "redundant where the conduct allegedly violating the implied covenant is also the predicate for breach . . . of an express provision of the underlying contract.") (citations omitted); *Harris v. Provident Life & Accident Ins. Co.*, 310 F.3d 73, 81 (2d Cir. 2002); *Alter v. Bogoricin*, 1997 WL 691332 at *7 (S.D.N.Y. 1997). The Court notes that SliceX has failed to articulate any implied duty owed by Aeroflex other than those expressly imposed under the parties' agreement. Indeed, SliceX's claim for breach of the implied covenant is predicated on the same factual averments that form the basis of its breach of contract claim: that Aeroflex improperly solicited SliceX employees. (*See* Complaint ¶ 20 (constituting SliceX's entire Second Cause of Action: "The conduct of Aeroflex as outlined above [in support of SliceX's breach of contract claim] has breached the Covenant of Good Faith and Fair Dealing implied in the Agreements.").)

      6.    Here, the parties' contractual rights and obligations were clearly defined in the Agreements:

a.    The Agreements described the work to be done by SliceX and specified the rate of compensation due from Aeroflex. (*See* Fact ¶ 2; Trial Exs. 1, 3, 5.)

b.    The Agreements contained express provisions governing the hiring of SliceX's employees by Aeroflex. (*See* Order at 4-7; Trial Ex. 1 at ¶ 4; Trial Ex. 3 at ¶ 5; Trial Ex. 5 at ¶ 4.)

        c.      Aeroflex had the right to terminate the Agreements at any time upon giving notice to SliceX.  (*See* Fact ¶ 4; Trial Ex. 1 at ¶ 6(b); Trial Ex. 3 at ¶ 7(b); Trial Ex. 5 at ¶ 6(b).)

        d.      Aeroflex had no contractual obligation under the Agreements to not open a competing design facility.  (*See* Trial Exs. 1, 3, 5.)

        e.      Aeroflex had no duty to leave its design work with SliceX beyond the terms of the Agreements or to the derogation of its express right to terminate.  (*See* Trial Exs. 1, 3, 5.)

        7.      The Court may not impose duties on Aeroflex in addition to those expressly provided in the Agreements.

**C.**      **Aeroflex Did Not Breach the Implied Covenant of Good Faith and Fair Dealing.**

        8.      Based on the evidence presented and testimony heard at trial, the Court therefore finds that:

        a.      Aeroflex's retention of SliceX was "at will" under the Agreements, and SliceX's legal expectation was to receive compensation for whatever design services it performed.

        b.      Aeroflex fully performed its obligations under the Agreements by paying SliceX in full for all services rendered and took no other actions to interfere with SliceX's performance under the Agreements.

        c.      Because Aeroflex had the unfettered right to terminate the Agreements at will by giving notice, SliceX understood that it might not be retained to perform all of the work set forth in the Agreements.  (*See* Fact ¶ 4; Trial Ex. 1 at ¶ 6(b); Trial Ex. 3 at ¶ 7(b); Trial Ex. 5 at ¶ 6(b).)

  d. SliceX's failure to generate sufficient business to pay and/or retain its employees justifiably generated concern on the part of Aeroflex.

  e. SliceX had no legal expectation of additional work from Aeroflex beyond the terms of the Agreements.

  f. SliceX received its bargained-for consideration and enjoyed the fruits of the Agreements.  (*See* Fact ¶ 5.)

  g. Aeroflex's posting of openings on Monster.com did not breach the non-solicitation clauses of the Agreements.

  9. Based upon the foregoing, the Court concludes that Aeroflex did not breach the implied covenant of good faith and fair dealing and that SliceX cannot prevail on its second claim for relief, which is premised on the assertion that Aeroflex improperly solicited individuals employed by SliceX.

  10. Thus, judgment is hereby entered in Aeroflex's favor on SliceX's claim for breach of the implied covenant of good faith and fair dealing, and that claim is hereby dismissed with prejudice.

DATED this 11th day of October 2006.

                _____
                The Honorable Ted Stewart
                United States District Court Judge